## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**UNITED STATES OF AMERICA**

**v.**

**TUCKER WESTON,**

      **Defendant.**

</td><td>

**Case No. 23-CR-174 (RBW)**

</td></tr>
</table>

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Tucker Weston to 27 months' imprisonment, 36 months' supervised release, $1000 in restitution, and the mandatory assessment of $100 for each felony conviction. The government calculates the guidelines range in this case to be 24-30 months' imprisonment, with the government's recommendation coming at the mid-point.

## I.      INTRODUCTION

The defendant, Tucker Weston, a 35-year-old Boeing employee from Seattle, Washington, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Weston flew to D.C. with his former roommate to protest the results of the presidential election. Weston marched from the "Stop the Steal" rally to the Capitol with a large group and was one of the first rioters to breach the barricades near the Peace Circle. Weston proceeded to rush up the West Plaza, where he assaulted an officer. Weston stayed on the West Plaza for over two hours where he repeatedly sought out confrontations with police. Eventually, Weston made his way into the Capitol through a broken window in the Senate Wing Door hallway. Weston exited the Capitol building but stayed on Capitol grounds for the rest of the day, where he attempted a second breach at the North Door. Before exiting Capitol grounds, Weston damaged media equipment on the east side of the Capitol. In all, Weston was on Capitol grounds and within the Restricted Area for well over five hours, and during that time, he repeatedly engaged in disruptive, destructive, and assaultive behavior.

The government recommends that the Court sentence Weston to 27 months of incarceration for his convictions of violating 18 U.S.C. § 231 (a)(3) and 18 U.S.C. § 111(a)(1). A 27-month sentence reflects the gravity of Weston's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

ECF 44, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Weston's Role in the January 6, 2021 Attack on the Capitol**

Weston flew from Seattle to Washington, D.C. on January 5, 2021 with his roommate and co-defendant, Jesse Watson[2], to protest the results of the 2020 presidential election.

On the morning of January 6, 2021, Weston attended the "Stop the Steal" rally at the Ellipse.   After attending the rally, Weston marched with other protestors towards the grounds of the U.S. Capitol.

On January 6, 2021, metal barricades and snow fencing, placed by U.S. Capitol Police officers, were around the U.S. Capitol building and grounds.   The barricades and fencing were intended to keep the public away from the Capitol building and the Congressional proceedings, which were to take place inside. Around 12:52 p.m., a crowd of rioters overran the line of officers, dismantled, and removed the barricades and snow fencing near the Peace Circle Monument, which is to the west of the Capitol building.   As seen in Image 1 (Ex. B[3]), Weston helped remove a metal barricade, which enabled the crowd of rioters to advance closer to Capitol building.

---

[2] Weston and Watson were charged together via complaint on October 18, 2022. The government filed an information on March 17, 2023, charging Watson with four misdemeanors. On May 12, 2023, Watson pled guilty to violating one count of 40 U.S.C. § 5104(e)(2)(G). This Court sentenced Watson to three years of probation.

[3] The government submits as an attachment to this memorandum, an exhibit list that includes a brief description of Weston's conduct in each exhibit and where Weston can be seen in the video at specific times.



**Image 1: Weston removed a metal barricade near the Peace Circle Monument.**

Once past the Peace Circle Monument, Weston moved closer to the Capitol building and reached the Lower West Plaza, an area at ground level and immediately outside of the Capitol building.   At approximately 12:58 p.m., a group of the rioters pulled down a black fence barricade between the rioters and the building.   As seen in Image 2, shortly after the barricade was pulled down, Weston stepped over the black fence, then turned toward the crowd of rioters and celebrated. He then continued his approach to the Capitol.



**Image 2: Weston celebrating as he advanced closer towards the Capitol Building.**

A few moments later, Weston shoved officers who were trying to prevent the rioters from progressing any closer to the Capitol Building. As Weston shoved an officer, other USCP officers sprayed the crowd with oleoresin capsicum (OC) spray[4]. (*See* Images 3 and 4; Ex. C).



---

[4] OC spray is commonly referred to as "pepper spray" and is a common crowd control measure employed by law enforcement.



**Images 3-4: Weston pushed officers by the scaffolding near the Inaugural Stage.**

Around 1:13 p.m., Weston moved to the south side of the West Plaza as MPD officers arrived on the scene to assist USCP in guarding the Capitol building. Upon arrival, MPD used bike racks to reestablish the police line and to create a barrier between the Capitol building and the rioters. Weston approached this police line as another rioter began yelling at the police. That rioter assaulted an MPD officer, and Weston shoved other officers attempting to subdue that rioter. (*See* Image 5; Ex. D).



**Image 5: Weston intervened to prevent police from subduing another rioter.**

After assaulting the officer, Weston adopted an aggressive stance with his fist clenched

toward police protecting their line from the rioters. Weston was sprayed with OC spray but did not

heed commands to back away from the line. (*See* Images 6 and 7 Ex. E).





**Images 6-7: Weston assumed a fighting stance and did not retreat as police deployed OC spray and struggled to push rioters away from the police line.**

Later, Weston made his way to the north side of the Plaza. Once there, Weston joined with a group of rioters in using a bike rack to push against law enforcement. (*See* Image 8; Ex. F).



**Image 8: Weston helped push a bike rack against the police line.**

During his two hours on the West Plaza, one of the most violent areas of the Capitol on January 6, Weston witnessed other rioters push, punch, and use pepper spray against officers. At multiple points Weston yelled at law enforcement to "Come on" and "Fuck you." For two hours, Weston yelled and screamed as part of the large and violent mob.

At some point, Weston left the Lower West Plaza and moved up the Northwest Stairs to the Upper West Terrace. Around 3:14 p.m., Weston entered the Capitol Building through a broken window next to the Senate Wing Door. (*See* Image 9; Ex. G).



**Image 9: Weston entered the Capitol Building through a broken window at 3:14 p.m.**

Weston remained in the building only briefly, before exiting through the Senate Wing Door and back onto the Upper West Terrace. (*See* Image 10; Ex. G).



**Image 10**

Weston made his way to the North Portico of the Senate Wing where, at around 3:30 p.m., he and other rioters attempted to make entry through the North Door. Here, Weston saw a violent clash between rioters and law enforcement officers, including the use of tear gas, smoke bombs, and OC spray. (*See* Image 11; Exhibit H).



**Image 11: Weston as he watched rioters attempt entry at the North Door.]**

After law enforcement removed Weston and other rioters from the North Portico, Weston proceeded to the northeast corner of the Capitol, where he found a group of rioters vandalizing media equipment. Weston and other rioters kicked and smashed the media equipment. (*See* Image 12; Ex. I).



**Image 12: Weston kicked media equipment by the AP Media Pen.**

Finally, Weston and another rioter walked off with a bag of media equipment from the media pen. After searching the bag and discovering the contents did not contain anything interesting, Weston left the bag by a tree.

*Weston's Interview with the FBI*

As part of his plea, Weston agreed to sit down for a debrief with the FBI. During that interview Weston minimized his behavior on January 6. For example, Weston described his efforts to clear the bike rack barricades at the Peace Circle as trying to move a tripping hazard for people, as opposed to clearing the way for rioters to move freely toward the Capitol building. When asked about the atmosphere on the West Front of the Capitol, Weston described as "enjoyable and

comical." Many times, Weston minimized his behavior and did not appear to grasp the seriousness of his conduct that day.

### III.    THE CHARGES AND PLEA AGREEMENT

On May 17, 2023, a federal grand jury returned an indictment charging Weston with eight counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On July 31, 2023, Weston entered a plea of guilty to Count One, 18 U.S.C. § 231(a)(3) and Count Two, 18 U.S.C. § 111(a)(1).

### IV.    STATUTORY PENALTIES

Weston now faces sentencing on Count One, 18 U.S.C. § 231(a)(3) and Count Two, 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Weston faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count One, and 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on

Count Two.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Guidelines analysis for both Counts One and Two is as follows:

Count Two: 18 U.S.C. § 111(a)(1)[5]

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| **Combined Offense Level** | | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* Plea Agreement at ¶¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

---

[5] The government believes, and the PSR concurs, that both counts of conviction here group. PSR ¶¶ 49-61.

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Section 4C1.1 does not apply in this case because Weston does not meet the criteria set forth in USSG §§ 4C1.1(a)(3) as he engaged in violence or credible threats of violence against people or property. PSR ¶60 Weston's actions on the West Plaza, at multiple points, encompassed the use of or credible threats of violence. For example, Weston assaulted an officer upon first breaching the West Plaza as USCP tried to control the crowd. *See* Ex. C. Additionally, Weston forcibly resisted MPD officers trying to subdue the crowd. *See* Ex. D & E. Finally, when Weston joined other rioters in pushing a bike rack back into a police line as seen in Ex. F, he engaged in violence against police.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 66. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, Weston's Guidelines imprisonment range is 24-30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Weston's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Weston placed himself at the front of rioters as they overran the police barricades at the Peace Circle, and he was at or near the front lines of confrontations between

rioters and police for hours at the West Plaza. Indeed, Weston committed three separate acts of assault and interference with police throughout the day. Weston then left the violence of the West Plaza to go into the Capitol building, which he entered through a broken window. Afterward, Weston stayed on Capitol grounds for a few more hours. He tried to re-enter the building through the North Senate Doors and joined in a crowd that damaged media equipment staged on the east side of the Capitol. The nature and circumstances of Weston's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Weston's criminal history report reveals no prior criminal convictions. The government is aware of a potential diagnosis of dissociative personality disorder that was disclosed to both probation and the government. However, no medical records documenting this condition, or its severity, have been provided to the government. Regardless, any such diagnosis would not explain Weston's multiple assaults and his willful disruptive conduct on Capitol grounds and in a restricted area on January 6.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Weston's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Weston participated in at least three separate and distinct instances of assaulting and/or interfering with police during his two hours on the front lines of the West Plaza. Weston did not stop there: he entered the Capitol itself through a broken window, tried to gain entry a second time through the North Door, and finished his romp through Capitol Grounds when he joined other rioters in destroying media equipment. While not the most *violent* or *destructive* rioter at the Capitol that day, Weston was certainly one of the **busiest**. After all of this, as explained above, Weston described the day as "enjoyable." Weston has not shown any true remorse for his actions, rather he has expressed regret that he was caught. As such, the need for specific deterrence as to Weston is high.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own

17

set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Clifford Mackrell,* 21-cr-276 (CKK) the defendant, an unemployed, 23-year-old man from Wellington, Ohio, travelled with his father and co-defendant, Michael Mackrell ("Michael") from their home to Washington D.C. to attend the "Stop the Steal" rally held on January 6, 2021. Shortly before 2:30 p.m., Mackrell positioned himself on the front line of rioters

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

on the west front of the U.S. Capitol. In addition to contributing to the overall force of the crowd that overwhelmed the officers, Mackrell assaulted officers, including when he successfully struck and yanked at an officer's gas mask. Mackrell also assaulted Officer D.H and grabbed at his face, but fortunately did not injure him. Mackrell and his father also helped another rioter push a piece of plywood into a line of officers, moving them off their protective line. After pleading guilty to 18 U.S.C. § 111(a)(1), the Court sentenced Mackrell to 27 months' incarceration and 12 months' supervised release.

In *United States v. Jonathan Grace*, 23-cr-138 (RBW), the defendant was a knowing, relentless participant in the Capitol riot on January 6, 2021. After illegally entering Capitol grounds, Grace maneuvered through thousands of rioters, made his way to the Lower West Terrace, and entered the tunnel. Grace joined the attack in the tunnel three times. During one stint in the tunnel, Grace joined the mob and used the full force of his body weight to collectively push against the officers as rioters coordinated the pushes by yelling, "Heave! Ho!" Even after officers finally cleared the tunnel, Grace remained at the mouth of the tunnel and continued to fight the officer line for another thirty minutes, eventually pushing his way back into the tunnel for a third time. Grace plead guilty to one count of 18 U.S.C. § 111(a)(1). This Court sentenced Grace to 24 months' incarceration and 36 months' supervised release.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Weston must pay $2,000 in restitution, which reflects in part the role Weston played in the riot on January 6.[11] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Weston's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 145.

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. §§111(a)(1) and 231(a)(3) subject him to a statutory maximum fine of $95,000 for both Counts One and Two. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' imprisonment, 36 months' supervised release, $1000 in restitution, and the mandatory assessment of $100 for each felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     *s/ Kyle M. McWaters*
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street, NW
Washington, DC 20530
(202) 252-6983
kyle.mcwaters@usdoj.gov