# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **No.    1:23-cr-00174-RBW** |
| | § | |
| **TUCKER WESTON** | § | **FILED UNDER SEAL** |

## DEFENDANT'S SENTENCING MEMORANDUM

TO THE HON. REGGIE B. WALTON, SENIOR UNITED STATES DISTRICT JUDGE:

COMES NOW TUCKER WESTON ("Weston"), Defendant, and submits this Sentencing Memorandum and requests a non-guidelines sentence of either probation or a brief term of imprisonment followed by supervised release and no fine. The request is consistent with the objectives of 18 U.S.C. § 3553(a) reflects the nature and circumstances of Weston's offense, history, and characteristics, and will be "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a).

## I.    INTRODUCTION

This Court is faced with the difficult task of punishing an individual, Tucker Weston, who though he has accepted responsibility and is remorseful, committed crimes under circumstances that offend the foundation of American government – the peaceful transfer of power after a democratically held election.  This task is made doubly difficult because these crimes, and those of others in the mob, were, according to the Indictment in *U.S. v. Donald J. Trump,* No. 1:23-CR-00257-TSC at ECF No. 1, inspired by a criminal conspiracy led by then President Donald J. Trump "to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election."  *Id.* at p.2.  It worked. "[Donald J. Trump] urged his supporters to travel to Washington on the day of the certification proceeding…'Big protest in D.C. On January 6th. Be there, will be wild!'"  *Id.* at

p.32, ¶87. Tucker Weston, his roommate, and many others listened and chose to travel to Washington D.C., as requested. Then, "on the morning of January 6, the Defendant [Donald J. Trump] and co-conspirators repeated knowingly false claims of election fraud to gathered supporters…and directed them to the Capitol to obstruct the certification proceeding." *Id.* at p.6,. ¶10.e.   Doing so, Trump said "'we fight.  We fight like hell. And if you don't fight like hell, you're not going to have a country anymore." *Id.* at p.39. Again, Tucker Weston chose to listen to Donald J. Trump (who continues to evade accountability for his actions[1] and may yet again hold the very office he refused to peacefully vacate in the manner of all forty-four of his predecessors) and went to the United States Capitol along with thousands of others who became a mob.   At the Capitol, Tucker Weston, individually, chose to commit crimes.

Despite however enthusiastic he may have been on January 6, 2021, and unlike Donald J. Trump and many others in that mob, Tucker Weston has accepted responsibility for his crimes on January 6, 2021, submitted to the rule of law, and shown sincere and genuine remorse.  Weston's crimes at the Capitol are inconsistent with anything else in his life before or since.  This memo is an attempt to place Tucker Weston's conduct into context to address the 18 U.S.C. 3553 factors in support of a non-guidelines sentence.

The Supreme Court has held a district court "may not presume that the Guidelines range is reasonable," but must, instead, "make an individualized assessment based on the facts presented." *Gall v. United States,* 128 S.Ct., 586 at 597, 552 U.S. 38 at 50 (2007); *see also Nelson v. United States,* 129 S.Ct. 890, 892, 555 U.S. 350, 352, 172 L.Ed.2d 719 (2009).   Mr. Weston humbly

---

[1] Donald J. Trump's claim of official immunity for crimes relating to the Capitol Riot and other matters is pending before the United States Supreme Court.  *Donald J. Trump v. United States,* No. 23-939 (argued April 25, 2024).   According to professional Court watchers, he may prevail. *See, e.g.,*  Howe, Amy, "Supreme Court appears likely to side with Trump on some presidential immunity" SCOTUSblog  (April 25, 2024) available at https://www.scotusblog.com/2024/04/supreme-court-appears-likely-to-side-with-trump-on-some-presidential-immunity/ (last viewed May 16, 2024).

submits that the advisory guidelines sentence is neither reasonable nor appropriate in this case. By requesting a variance, Mr. Weston does not seek to discount the gravity of his crimes nor seek to avoid an appropriate punishment. Instead, the requested sentence will adequately serve the statutory goals of sentencing as well as the ends of justice.

There were many paths to the Capitol on January 1, 2021, and there are many paths away from what happened there. This is Tucker Weston's attempt to explain his.  Weston's personal statement, attached as Exhibit "A" is a meaningful reflection by him on his actions, his remorse and efforts to make amends.  Exhibit "B" is a Forensic Neuro Psychological Evaluation; and Exhibit "C" are letters from friends and family all of which may assist the Court in determining an appropriate sentence.

## II.  ARGUMENT

**A.  The Requested Sentence is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing Considering the Nature and Circumstances of the Offense and Weston's History and Characteristics as per 18 U.S.C. § 3553(a)(1)**

### 1)  Nature and Circumstances of the Offense

Weston's criminal conduct on January 6, 2021, is correctly described in the Statement of Offense and Presentence Investigation Report ("PSIR"). ECF No. 44 and 54.   In summary, Weston enthusiastically traveled to the Capitol from the ellipse, placed himself at the front of many others, helped move barricades, confronted officers, shoved officers, cussed officers, entered the Capitol, then quickly left and vandalized stacked media equipment on the Capitol grounds with a woman he met. *Id.*

### 2)  Mr. Weston's History and Characteristics

Tucker Weston is a 35 year-old unmarried childless Boeing employee who lives with his elderly mother, Deborah Dalman, in the Seattle, Washington area.  She has written a letter

describing his upbringing which is at the beginning of Exhibit C.  His history and characteristics are also described in the other two Exhibits and the PSIR.

As a child, Tucker was the subject of acrimonious custody battles between his parents which resulted in court ordered psychological evaluations and treatment for anxiety and depression.  Dkt. 54, p. 13, ¶75; Ex. B, p. 4.  At one point he lived with his father, step-mother and half-siblings, but did not get along with them. He was lonely and isolated during that time. Ex. B. at p. 2.  His mother survived ovarian cancer and he ran away from on several occasions. *Id.* At one point, Tucker was in foster care for about six months, then returned to his father until about half-way thru high school when he returned to his mother.  *Id.*  In elementary school, Tucker was found to have dyslexia. *Id.* at p. 3; Ex. C at p. 2. This caused learning difficulties, but he ultimately became a better student. However, at 15, as numerous attachments relate, Tucker suffered a traumatic brain injury while boxing which caused difficulties sleeping, anxiety, and focusing.  Several people who have known Tucker for many hears write about this event and the changes they saw. Ex. C at pp. 6, 8.  In 2006, he graduated from high school and began college. Dkt. 54, p.15, ¶¶92-95. First, Weston attended the University of Washington, and years later, community college.  *Id.*

Since leaving the University of Washington in 2008, Weston has held a wide variety of jobs: construction, veterinary clinic courier, pharmacy technician, and in restaurants. Ex. B at p.3. Prior to this arrest, Weston was happily employed for five years as a bus driver for the King County Metro Transit.  Dkt. 54, p.101. He was terminated as a result of this prosecution, which termination is currently the subject of an arbitration.  Presently, Weston is an airplane tank mechanic for The Boeing Company in Everett, Washington, and a union member.  Dkt. 54, p.16 at ¶100; Ex. B, p. 3.

a) **Forensic Evaluation**

████████████████████████████████████████████

██████████████  ████████████████████████████████

████████████████████  ████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████,

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

Weston includes this evaluation as part of history and characteristics for the court to consider under § 3553(a), not an excuse.

**b) Letters of Support**

In addition to his mother, Tucker's childhood friend and college roommate Adnan Kaya, wrote a letter on his behalf.  Mr. Kaya relates that Tucker suffered emotional and sometimes physical abuse from his father. Ex. C, p. 6.   Adnan Kaya also saw Tucker take blows to the head and the resulting effects on Tucker's studies.  *Id.*   Mr. Kaya, a Democrat, relates that he has peacefully disagreed with Tucker on many occasions and that he believes Tucker thought he was going to a protest rather than a riot.  *Id.* at pp. 6-7.  Kaya also sees that Tucker is ashamed of the beliefs that brought him to the Capitol Riots and is remorseful.  *Id.* Mr. Kaya believes that Tucker's primary value is taking care of his mother who depends on him financially.

Corey Westbrook, Tucker Weston's cousin, has known him his entire life. Ex. C, p.8. He writes of Tucker's challenges growing up the subject of a custody battle that were difficult for him, as well as Tucker's mother's cancer treatment. *Id.* Mr. Westbrook describes Tucker's boxing injury and its lasting change on him. *Id.* He also tells of Tucker expressing sincere regret about his involvement in the Capitol Riots.  But more importantly, Mr. Westbrook describes Tucker Weston's care and love for his mother and her dependence on him.  *Id.* at p.9.

Laurie Hugdahl, who has worked with Tucker Weston's mother for over twenty years, describes the Tucker Weston she knows. Ex. C at p. 11. In addition to describing, as others have, the love and devotion he shows his mother, she speaks of Tucker's volunteer work at Fallen

Brothers, a local food bank. *Id.* She writes, "[t]his is labor-intensive, very unglamourous work that we do in every conceivable type of weather. Nevertheless, I can always count on Tucker to absolutely be one of the hardest workers we have, be completely responsible, be friendly with other volunteers, to use common sense, to be proactive, and be respectful of the people that come through our lines for food. Other volunteers are always happy when they know he is signed up to be on our team because he is so personable and hardworking." Ex. C at p.11.

Mrs. Mary Pat O'Leary knows Tucker Weston through his caregiving for her late former husband, Scott Chambers. Ex. C, p.13. She describes Tucker as being patient, kind, attentive and compassionate. *Id.* She relates how Tucker took Mr. Chambers for outings so that he would not bee isolated, and physically support him. When he passed, Tucker supported her in her grief, as well. *Id.*

Another lifelong family friend, Sandra Wikan, describes Tucker as mild-mannered young man and was shocked to learn of his conduct on January 6, 2021. Ex. C., p.14. Like the others, Ms. Wikan describes his mild-mannered youth, her surprise that the was at the Capitol Riot, and his mother's dependence on Tucker. *Id.*

Family friend Wilie Wellington, 79, has also known Tucker since he was ten years old. Ex. C. at p.15. He describes Tucker as a well behaved respectful young man growing up. *Id.* Mr. Washington mentions Tucker's job as a METRO King County Transit operator, which Tucker lost as a result of this case. *Id.* Mr. Washington was surprised by Tucker's involvement in the Capitol Riots and believes he is remorseful for his actions and Tucker's efforts at positive change, including volunteer work at a food bank. *Id.*

These letters are consistent in their surprise that the mild mannered and devoted son each writer has known participated in the Capitol Riot.

**B.      The Requested Sentence Serves the Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)**

Mr. Weston's crimes are serious, but the advisory guidelines range of 24-30 months is not necessary to satisfy this sentencing mandate in this case.  Tucker Weston accepts that he should not have touched *anyone*, proceeded into *any* unauthorized location, or done anything else he did that day.  But thankfully, no officer appears to have been injured by Weston's actions and Tucker Weston did not break the window he entered through or damage anything inside the Capitol building in the brief time he was in the area adjacent to the Senate Wing Door.  Dkt. 44 at p.9, ¶19. The Court may also wish to consider that hundreds of other Defendants, who have been convicted of crimes of obstruction of an official proceeding for similar conduct, may have their § 1512(c) convictions vacated by the Supreme Court,[2] and the alleged architect of the Capitol Riot, Donald J. Trump, found immune, whereas Tucker Weston will remain a convicted felon for life, with the collateral consequences and disenfranchisement that entails.

**C.      The Requested Sentence of Sufficiently Addresses the Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

For Mr. Weston, the deterrent against any future criminal conduct is the prospect of another prosecution, arrest, or incarceration.  What Weston has experienced thus far in this case, including the collateral consequences of losing his job, public shame, embarrassment, and humiliation, are unlike anything he has ever known and sufficient to deter him in the future.  As to general deterrence, the prosecution and punishment of hundreds of January 6, 2021, Capitol Rioters has already been widely publicized.  A longer sentence for Weston is unlikely to have a greater impact on the public than the general awareness that already exists.  Indeed, the media and public's attention appears to be currently focused on trials of the former President, not individual rioters.

---

[2] *Fischer v. United States,* No. 23-5572 (argued April 16, 2024).

The Department of Justice, Office of Justice Programs, National Institute of Justice "Five Things About Deterrence" publication of May, 2016,[3] states on its face that "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime….Increasing the severity of punishment does little to deter crime." *Id.* at p.1.  Although this publication does not reflect official DOJ positions or policies, it is consistent with other research beyond that cited therein. *Id.; see, e.g.*  Michael  Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1 at 28-29 (2006)[4] ("Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion… as has every major survey of the evidence."). There is simply no evidence that a variance will have any less deterrent effect on any other person

**D.    The Requested Sentence Sufficiently Addresses the Need to Protect the Public from Further Crimes of Weston, 18 U.S.C. § 3553(a)(2)(C)**

A below guidelines sentence would not subject the public to any additional danger from Mr. Weston whose crime was the result of misplaced loyalty to one person and the events of one occasion, both of which he disavows.  *See* Ex. A.  Moreover, given his successful conduct on pre-trial release, the imposition of a period of either probation or supervised release after a brief term of incarceration will continue to protect the public.

**E.    A Guidelines Sentence is not the Most Effective Manner to Provide Weston with needed medical care, or other correctional treatment 18 U.S.C. § 3553(a)(2)(D)**

Mr. Weston will better able to obtain the psychological treatment he continues to undergo outside the Bureau of Prisons than in it. The continuity of care of his current treatment providers will ensure that his progress is monitored and adjusted as necessary.  Moreover, the Court may

---

[3] Available https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last viewed May 16, 2024).

[4] Available at https://scholarship.law.umn.edu/faculty_articles/495  (last viewed May 16, 2024).

impose conditions of either probation or supervised release that will ensure that Mr. Weston maintains compliance with the law and any treatment.

**F.      The Requested Sentence is Within the Kinds of Sentences Available, 18 U.S.C. § 3553(a)(3)**

There is no statutory mandatory minimum prison sentence for either count of conviction. This Court has the discretion to sentence him to probation, a split-sentence, or  brief period of incarceration or even time served followed by a term of supervised release of up to three years. *See* Dkt. 54 at p.19, ¶125.   A variance below the advisory range of 24-30 months imprisonment is well within the regime created by Congress. A variance would not create any unwarranted disparity compared to similarly situated January 6, 2021, Defendants.

**G.      The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities 18 U.S.C. § 3553(a)(6)**

18 U.S.C. § 3553(a)(6) states that courts shall consider "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* (2004) at 113.[5]    Although there are a wide range of sentences imposed for the crimes Weston has plead guilty to, there are examples of similarly situated individuals being sentenced to terms of imprisonment below the advisory

---

[5] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last viewed March 16, 2023).

guidelines range in this case.

The defendant in *U.S. v. Tony Sargent,* Case No. 1:21-CR-00258-TFH was sentenced by Judge Hogan  to **14 months** incarceration and 24 months supervised release after pleading guilty to the same crimes as Weston (18 U.S.C. § 231(a)(3), and 18 U.S.C. § 111(a)(1)) as well as violations of 18 U.S.C. § 1752(a)(1), § 1752(a)(2), § 1752 (a)(4), and 40 U.S.C. § 5104(e)(2)(F). *See Id.* at ECF No. 74. In that case, the Government requested 27 months.  *Id.* at ECF No. 70.  Like Weston, Mr. Sargent traveled from out of state with a friend to attend the former President's so-called rally.  *Id.* at p. 8.  Mr. Sargent climbed a media tower, then went to the front of the police line and swung an open hand at U.S. Capitol police, making contact, then retreated.  *Id.* at pp. 11-12.  He then returned to strike the officer again, missed and hit a fellow rioter.  *Id.*

The defendant in *U.S. v. Philip Young,* Case No. 1:21-cr-00617-DLF plead guilty to the same crimes as Weston as well as four additional offenses,  § 1752(a)(2), § 1752 (a)(4), and 40 U.S.C. §§ 5104(e)(2)(D) and (F), yet was sentenced by Judge Freidrich, a former member of the United States Sentencing Commission, to only **8 months** incarceration.  *Id.* at ECF No. 38. The prosecution unsuccessfully requested a prison term 27 months, more than three times that imposed. *Id.* at ECF No. 40, p. 61.

The defendant in *U.S. v. David Mehaffie,* No. 1:21-cr-00040-TNM-7, after a bench trial, was sentenced by Judge McFadden to **14 months** incarceration followed by two years supervised release for the same crimes as Weston as well as two additional offenses, 40 U.S.C. §§ 5104(e)(2)(D) and (F). *Id.* at ECF No.  575. According to the prosecution, Mr. Mehaffie led the charge and attack on the Lower West Terrace Tunnel of the Capitol and a "coordinated attack on officers, resulting in untold injuries." *Id.* at ECF No. 526 at pp. 13-22. The prosecution sought 64 months incarceration, nearly five times the 14 months imposed.  *Id.* at p. 40.

This Court sentenced a defendant convicted by a jury, and testified, in *United States v. Donnie Wren,* No. 1:21-CR-00599-RBW to **12 months and 1 day** incarceration followed by 24 months supervised release after pleading guilty to both Weston's offenses (§§ 111(a)(1) and 231(a)(3)) as well as also 18 U.S.C. § 1752(a)(1).  *Id.* at ECF No. 173.  The Government had asked for 51 months incarceration, more than four times the sentence this Court imposed.  *Id.* at ECF No. 158, p. 1.

Earlier this year, this Court sentenced the Defendant in *Jacob Zerkle,* No. 1:22-CR-00100-RBW, who was convicted of the same offenses as Weston to **24 months,** 3 years supervised release, and 200 hours community service,  approximately one third less than the 34 months sought by the prosecution.  *Id.* at ECF 82 and 86.

There are numerous examples of individuals convicted of only 18 U.S.C. § 111(a)(1) assaults, which is arguably the more serious of Weston's crimes, receiving sentences less than the advisory range in this case.

### III.  WESTON REQUESTS A VARIANCE

As the Supreme Court said in *Rita*, a defendant's argument for a lower sentence may "take either of two forms."  *Rita v. United States*, 551 U.S. 338, 344 (2007).   The defendant may "argue *within the Guidelines' framework*, for a departure." *Id*. (emphasis in original).  Or, the defendant may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a lower sentence." *Id*. (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)).  Mr. Weston seeks a variance, not a departure.

"'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708, 714 (2008).  A departure can "only be made based on the 'the sentencing guidelines,

policy statements, and official commentary of the Sentencing Commission,'" but "there is no longer a limit comparable . . . on the variances that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a)." *Id.* at 714-15.  While a district court must consider "pertinent" policy statements, 18 U.S.C. § 3553(a)(5), policy statements are "pertinent" only to the first kind of argument the Supreme Court identified in *Rita*: "departures." Mr. Weston seeks a variance, not a "departure."  Thus, any USSC policy statements do not apply to the variance Mr. Weston requests.

In fiscal year 2023, judges cited numerous reasons for a downward variance from the guideline range which have been compiled by the USSC.  U.S. Sent'g Comm'n, U.S. Sent'g Comm'n, 2023 Sourcebook of Federal Sentencing Statistics, at tbl. 44.[6]  Among these, Judges cited the history and characteristics of the defendant as per 18 USC 3553(a)(1) in below guideline sentences 12,434 times, more than any other reason.  *Id.*  These Judges also cited a reason for their below guidelines sentences more than 9,030 times to "Reflect seriousness of offense/promotes respect for law/just punishment," 7,532 to afford an adequate deterrent, 5,219 times to protect the public, and 4,342 times avoid unwarranted sentencing disparities, 2,881 for acceptance of responsibility, 2,693, for remorse, 2,537 for mental and emotional conditions, 2,297, for tragic or troubled childhood, 1,300, for conduct while on release, bond or supervision, the same bases for which Mr. Weston requests a below guidelines sentence based on *Booker/*§ 3553(a).  *Id.*

In response to a 2010 Commission survey, 62% of judges said that family ties and responsibilities are "ordinarily relevant" to variance consideration U.S. Sent'g Comm'n, Results

---

[6] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table44.pdf

of Survey of United States District Judges January 2010 through March 2010, tbl. 13 (2010).[7]

Asked why they do not rely on departures, 76% of judges said that the "*Guidelines Manual* does

not contain a departure provision that adequately reflects the reason for the sentence outside the

guideline range," and 65% said the policy statements are "too restrictive." *Id*. at, tbl.14.[8]

Departure policy statements, to the extent that they discourage or restrict consideration of any

relevant factor, do not control variances.  Mr. Weston requests a variance based upon the 18 USC

3553 factors.

## CONCLUSION

The Guideline calculation in this case fails to appropriately take into account the other 18

U.S.C. § 3553 factors demonstrating that there is no need to imprison Mr. Weston as advised by

the United States Sentencing Guidelines.  The goals of sentencing will be achieved most

effectively through a sentence of probation or a brief term of incarceration followed by supervised

release.  This requested variance is available by statute, is within the Court's authority, and

appropriate in this case under the § 3553 factors.


Respectfully submitted,

*/s/ Q. Tate Williams*
Quentin Tate Williams
Texas Bar No. 24013760
Philip H. Hilder
Texas Bar No. 09620050
819 Lovett Blvd.
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112

---

[7] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf (last viewed April 3, 2024).

[8] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf (last viewed April 3, 2024).

tate@hilderlaw.com
philip@hilderlaw.com
*Admitted Pro Hac Vice*

ATTORNEYS FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Defendant's Sentencing Memorandum has been delivered to the Assistant United States Attorney and United States Probation Officer, via email on May17, 2024.

*/s/ Q. Tate Williams*
Q. Tate Williams

15

Dear Judge Walton,

Words fail to express the shame I feel for my actions at the Capitol on January 6th, 2021. I am profoundly sorry to have participated in the riot at the United States Capitol. I, and I alone, am responsible for my actions. I take full responsibility for what I did, and even though I never intended to harm anyone, I realize that my involvement was a grave mistake as my actions jeopardized the lives of the capitol police and put the lives of all who attended in danger.

Having now had ample time to reflect upon my conduct, I am deeply ashamed of the role I played in the criminal activity. The impulsive decisions I made that day created victims and tarnished 248 years of peaceful transfer of government. The riot at the capitol undermined the public's trust in our democratic republic and I am remorseful to have played a role. I've come to fully grasp the seriousness of my actions and their adverse effects on the safety, security, and democratic principles of our nation's capital, its people, and the cherished democratic processes we uphold. I sincerely regret the harm I've caused. I recognize that law enforcement officers are tasked with maintaining public safety and upholding the rule of law, and my actions not only endangered their well-being but also undermined the trust and respect that they deserve. I apologize sincerely to the Capitol police officers involved, as well as to their families and colleagues who were impacted by my behavior.

I'm committed to not only acknowledging my past mistakes but also to actively rectifying and learning from them. With the support of my therapist, I'm taking crucial steps to ensure I don't repeat similar errors. Previously, I neglected to seek help to manage the anxiety, depression, and depersonalization/derealization symptoms stemming from challenges in my family life and an acquired brain injury. This led to a distressing downward spiral exacerbated by alcohol.

Over the past year, I've been actively managing my mental health with prescribed medication, which has been a significant relief. These medications have helped me achieve a more balanced state, enabling me to handle stress better and nurture a more positive mindset.

Moreover, this treatment has opened the door for me to engage in talk therapy, a process that has been instrumental in unraveling the complex emotions surrounding the incident. Through therapy, I've been able to focus on personal growth and strive towards becoming a positive contributor to society.

Reflecting on the events of that day fills me with deep regret and shame. I now understand how extremist ideologies can drive violence and sow division. It's essential to clarify that violence is contrary to my true nature; my discomfort with conflict stems from the turbulence in my parents' marriage.

I am fully committed to embracing inclusive and tolerant values that foster unity among

the diverse population of the United States. I recognize that while individuals have the right to express their opinions and engage in peaceful protest, it's our responsibility as citizens to do so without resorting to violence.

To make amends and demonstrate my commitment to positive change, I have devoted myself to community service. Every Saturday of every week I donate my day to the Fallen Brothers food bank, which is held at the Shoreline Free Methodist Church. I believe that serving others is a meaningful way to contribute to the well-being of my community and to demonstrate my genuine desire to repair the harm I have caused. Engaging in volunteer work has profoundly influenced my well-being; I no longer experience feelings of powerlessness or worthlessness. Instead, I'm empowered by the knowledge that I have much more to offer. It is my hope that through community service, I can begin to make things right and rebuild trust within my community.

In essence, I am fully devoted to serving my community. I take proactive steps to ensure my well-being and conduct are in check. Thanks to my medication regimen and weekly therapy sessions aimed at personal development, I've grown increasingly mindful of my actions and their repercussions.

As you prepare to sentence me, I want to reiterate that I have never been in trouble with the law before, and I want you to know I am not a violent person. I have lost friends, a career I loved, and my pension due to my reckless behavior. I accept that this is a small price to pay for having attacked the Capitol. When I reflect on that day my mind immediately goes to the officers who were subjected to our abhorrent conduct; the turmoil they have had to endure is immeasurable compared with what I have had to pay.

My parents' disappointment in me has hurt the most. Both my mother and father were shocked and saddened to learn that their son took part in the attack on the Capitol on January 6th, 2021. Both my parents are elderly (mother is 76, father 80), and seeing their faces when they learned of my charges broke my heart. They raised me with values of respect, integrity, and responsibility. They deserve better and I have no excuse.

As you're aware, my parents are separated, and my mother resides with me. I support her financially as she relies solely on social security for income. I'm deeply troubled by the significant impact my incarceration will have on her life. Despite our challenging circumstances, my mother and I share a profound bond, and I'm immensely grateful for her unwavering love and the sacrifices she's made for me. It has always been my aspiration to repay her unconditional love by ensuring her comfort and abundance in her later years. The thought of her suffering during my imprisonment pains me deeply.

I understand that the consequences for my actions will far outweigh whatever time I may serve in prison, but when deliberating over the appropriate sentence, I implore you to please take into consideration that I am a loving son who never intended to harm anyone. I am deeply ashamed of my actions and sorry for the harm I have caused. Once again, I am deeply ashamed of my actions and profoundly remorseful for the harm I have caused.

Sincerely,

*Tucker Weston*



# DIANE M MOSNIK PHD INC

## DIANE M. MOSNIK, PH.D.
Clinical Neuropsychologist, Pediatric & Adult &
Forensic Psychologist
Licensed in the states of Wisconsin (# 2620-57)
& Texas (31547)

------------------------------------------------

316 East Silver Spring Drive, Suite 206
Whitefish Bay, WI  53217
Mobile: 832-483-9732
4dmosnik@gmail.com

Forensic Neuropsychological Evaluation

April 18, 2024

**NAME:**                          Mr. Tucker Weston
**DATE of BIRTH (age):**    ██████████████
**DATE of EXAM:**            04/27/2023
**REFERRAL SOURCE:**       Mr. Philip H. Hilder, Attorney
                                    Hilder & Associates, P.C.
                                    819 Lovett Blvd
                                    Houston, Texas   77006
                                    TEL:  713-234-1416

**INTRODUCTION.**

Mr. Tucker Weston was referred for a forensic psychological evaluation by his defense counsel, Mr. Philip H. Hilder, to determine the status of his mental health and level of functioning surrounding the time of the offense in order to assess for potential mitigating factors that contributed to the offense to which he plead guilty.

At the time of this evaluation, Mr. Weston was a 34-year old, Caucasian male.  Mr. Weston was interviewed by this examiner through a video Zoom conference at the examiner's private practice outpatient office, on April 27th, 2023, for a total of four and one-half hours of direct client contact, one half-hour interviewing collateral informant, and an additional eight (8) hours was spent in record review, research related to the case, and incorporation of the data into a written report.  Neither Mr. Weston's attorney nor any other individuals were present during the assessment period.

Prior to the beginning of the forensic assessment, Mr. Weston was advised of the procedures and the purpose of the evaluation and informed of his right to consent or refuse participation in the evaluation.  He was informed that the evaluation was being conducted to gather information about his background, along with his current and past medical and mental health status and level of functioning to assess for any potential mitigating effects on his behavior surrounding the

DEFENDANT NAME:   Mr. Tucker Weston                                                    2
DOB (age):                07/07/1988 (36)
Requesting Individual:  Attorney Philip H. Hilder

time of the current criminal charges.  The client was informed that he would not be provided with
any therapy or treatment at any point during the assessment.  He was informed that he could
choose not to answer any questions or to terminate the evaluation at any time he so chose.  Mr.
Weston was informed that the evaluation would not be held strictly confidential in that it would
be shared with his attorney(s), any applicable courts, and potentially other attorneys or
individuals involved in his legal proceedings.  Mr. Weston agreed to participate in the forensic
assessment and was able to paraphrase back to the examiner an understanding of the
procedures to be completed during the visit after the examiner read through the consent form
and explained the contents to him.

**RECORD REVIEW.**

1.  

In rendering the opinions expressed below, I am relying on the information obtained from my
own forensic assessment completed directly with Mr. Tucker Weston and a review of the
information contained in the client's available records, as well as upon my professional training
as a clinical and forensic neuropsychologist, to support my opinions in this case.



DEFENDANT NAME:  Mr. Tucker Weston                                                    3
DOB (age):
Requesting Individual:  Attorney Philip H. Hilder



## EDUCATIONAL HISTORY.

Mr. Weston reported that he was pulled out of class during elementary school because of a learning disability in reading (dyslexia) and required additional help with reading and reading comprehension in a smaller group setting. He reported that due to his dyslexia, he struggled with learning during elementary and middle school. Mr. Weston reported that he experienced a traumatic brain injury at age 15 and experienced mental health issues during middle school, for which he saw a professional psychologist for treatment. Mr. Weston stated that he worked hard and was able to do well during high school. Mr. Weston graduated from Meadowdale High School in Lynnwood (Seattle), Washington, in 2006 with a GPA of 3.68. He enrolled in college at the University of Washington in the fall of 2006 in prescience but withdrew from the university in winter quarter 2008 due to difficulty concentrating in school and being uncertain about what he wanted to pursue for his degree or his career, resulting in a low GPA overall. He also reported that his father had been paying for his school tuition, but that the payments had stopped when his father reportedly went to Mexico for an extended stay and did not inform Mr. Weston, so he was unable to pay for school. At the time, it was reportedly court-ordered that his father pay for him to attend college. He reported that he had initially wanted to go into the medical field, but had difficulty in his classes, in part, due to his ongoing mental health condition which results in difficulty with complex thought and disrupted sleep, as well as difficulty maintaining attention and arousal during the daytime. He re-attempted college at Seattle University in the fall of 2012. He performed fairly well during the first two quarters, with grades of C's and B's and earning 27 credits out of 27 credits attempted; however, his grades declined during the spring quarter and he earned only 5 out of 15 attempted credits. He discontinued college after that year due to a low overall GPA. He reported that he experienced ongoing difficulty with anxiety and sleep disturbance while attending school, which negatively impacted his ability to focus on his studies. Mr. Weston reported that despite having a learning disability in reading and a mental health diagnosis, he had not sought out academic accommodations at either university.

## EMPLOYMENT HISTORY.

After withdrawing from the University of Washington in 2008, Mr. Weston reported that he went to work as a laborer in commercial construction, where he worked for two years on a full-time basis. He then received unemployment for approximately one year before getting a job as a courier for a veterinary clinic lab, where he worked for approximately two years. He continued working while he attempted to return to college at Seattle University in 2013. He reported that he worked as a security assistant in the restaurant industry for a couple of years, and did commercial property maintenance from 2015-2017. He worked for Metro transit as a bus driver since June 2017 until he was fired due to his legal issues in December 2022. He reported that he recently was hired at the Boeing Everett factory working in the fuel cell intake factory production assembly line and has become part of their union.

DEFENDANT NAME:   Mr. Tucker Weston                                              4
DOB (age):
Requesting Individual:  Attorney Philip H. Hilder

## MEDICAL HISTORY.



## CURRENT MEDICATIONS.

## PSYCHIATRIC HISTORY.

DEFENDANT NAME:   Mr. Tucker Weston                                    5
DOB (age):         ████████
Requesting Individual:  Attorney Philip H. Hilder



**HISTORY OF SUBSTANCE USE.**

DEFENDANT NAME:   Mr. Tucker Weston
DOB (age):        ██████████
Requesting Individual:   Attorney Philip H. Hilder

6



**RESULTS OF FORENSIC PSYCHOLOGICAL EXAMINATION.**



DEFENDANT NAME:  Mr. Tucker Weston
DOB (age):
Requesting Individual:  Attorney Philip H. Hilder

7



DEFENDANT NAME:  Mr. Tucker Weston
DOB (age):
Requesting Individual:  Attorney Philip H. Hilder

8



**CLINICAL AND BEHAVIORAL OBSERVATIONS BY THIS EXAMINER**.



DEFENDANT NAME:  Mr. Tucker Weston                                              9
DOB (age):                   ██████████  )
Requesting Individual:  Attorney Philip H. Hilder



## DIAGNOSTIC CRITERIA & BRAIN FUNCTIONING.



DEFENDANT NAME:  Mr. Tucker Weston                                           10
DOB (age):            ████████████ )
Requesting Individual:  Attorney Philip H. Hilder



currently meet criteria for other mood disorders, particularly unipolar depressive disorders.

**CONCLUSIONS.**



DEFENDANT NAME:   Mr. Tucker Weston                                                                11
DOB (age):          ███████████
Requesting Individual: Attorney Philip H. Hilder

**PROFESSIONAL OPINION.**

DEFENDANT NAME:  Mr. Tucker Weston                                              12
DOB (age):        ███████████
Requesting Individual:  Attorney Philip H. Hilder

committed.

I offer this history as mitigation for the Court to consider in the case of Mr. Tucker Weston.

Thank you for the referral of this forensic evaluation.



Diane M. Mosnik, Ph.D.
Forensic Psychologist and Clinical Neuropsychologist
Licensed in Wisconsin and Texas

DEFENDANT NAME:  Mr. Tucker Weston                                    13
DOB (age):        ████████
Requesting Individual: Attorney Philip H. Hilder

Hon. Reggie B. Walton
United States District Court for the District of Columbia
Constitution Avenue, N.W.
Washington, D.C. 20001

May 15, 2024

Hon. Reggie B. Walton:

My name is Deborah Dallman. I am Tucker Weston's mother. I am writing this kind of last-minute because Tucker didn't think anyone would listen to what his mom had to say. I hope that's not true. Tucker was born after his father and I were engaged and we were together for almost four years. I accidentally found out some serious information about his father's problem with honesty, and I called the engagement off. I cannot begin to tell you my shock when three weeks later at the age of 39 found myself pregnant. It only took a minute for me to realize that it would be better for the baby and myself if I continued on my way alone. Tucker's father offered me all kinds of situations including an abortion, money, and a house, but I told him (and I meant it) to just continue as he was. I said I would go on my way, and I didn't ask for money. It wasn't that I didn't need it, but I knew life would be easier the more separate his father and I were. His father is an attorney and a multimillionaire - he did not earn the money - for whom I would have been his third wife and he already had three kids. I loved his kids.

I had three children from my first marriage. They are all successful, independent, and without any criminal history. When Tucker was born and for most of his life, he has been very healthy.

Tucker's father was/is a multimillionaire attorney and according to the GAL was spending hundreds of thousands of dollars to get custody. I worked hard in court for Tucker to be able to see a good child psychologist regularly and to have reading tutoring since he was dyslexic and for me to

keep custody. Dyslexia is on both sides of Tucker's family. The financial disparity between Tucker's father and myself was extreme. Tucker appeared unfazed about it. However, most of the time I went to court by myself. His attorney father was accompanied by his attorney (a judge in Seattle) and another attorney and their court reporter. If it hadn't been so serious, it would have been comical.

When Tucker was 11 two things occurred. I became aware he was upset and was trying to figure out why when he blurted to me that he could not sleep well at his father's and his older brother there had taught him how to grow marijuana in his closet and use it to get to sleep. I just felt like dying. I also was aware there was a food situation. Tucker was frequently very hungry there. OMG.  I did two things. I explained to him his own body could help make a better aid for sleep, and Tucker started jogging/running. That took care of the sleep problem. Also, I took him to a lab and had him tested for drugs every other week for a year and a half. I told him that if he ever failed the test, I would still love him but I would also become his twin. We would go everywhere together. We would go to school, eat lunch together, and so on.

I would quit my jobs because to me he was more important. He knew I meant it, and he never failed the drug tests. Nothing would be more embarrassing to a child in junior high school than their mother following him around. At about the time he was getting ready for junior high, Tucker and his friend Chris started a lawn mowing business over the summer. He continued with Scouts and still had his weekly tutoring.  I don't know how aware Tucker was about his siblings on his father's side, but two of them were told to leave school due to drugs, and not return. I was also concerned about the disparity between Tucker's living situations. I was scraping by, but we were alright. Tucker was happy.

High school came, and Tucker outgrew the dyslexia. He was doing well and was elected to junior and senior student class offices. He was sent to Boy's

State which was a big honor. Unfortunately, the situation at his father's continued to be unhealthy in my opinion. Tucker did not want to go to Alaska, but his father insisted so off he went. Despite the court orders, Tucker's father almost never allowed Tucker and me communication while he was visiting so I was kept in the dark. When Tucker returned, he was upset and handed me the camera he took with. I immediately had the pictures developed. Several showed facial bruising and abrasions from his father hitting him.

Tucker pretty much stayed home with me from then on. Life for him settled way down except Tucker insisted on learning to box. I investigated the boxing situations and found one that emphasized safety. However, about 7 weeks into the course Tucker was knocked out TWICE. He did not tell me, but Chris who was taking the lessons with him did. I took Tucker to the doctor who ordered MRI's which are extremely expensive. I pleaded with Tucker's father to be able to use the insurance for Tucker. I mean, it was going to be a couple thousand dollars that I didn't have. His father refused in writing to allow the use of the insurance. He declared that he knew about concussions, and that Tucker didn't have a concussion and on and on! It was revolting. Tucker did not complain. He would take the ice packs that were in the freezer, lay down on his bed, and put them on his head. This was just terrifying to me. I tried really hard. I knew the best thing was to keep things calm and steady at home, and he refused to see or go to his father's house for quite a while.

Tucker is a very private person and always has been. This is the way he's been his entire life. I can also say that I have never ever seen Tucker be unkind or hurtful on purpose in any situation to anyone. Also, I have never heard of anyone who has seen Tucker be anything but nice to other people. When Tucker joined Metro, and I heard from other people about him donating weeks of his paid vacation time to other drivers who had families and were fighting cancer, I was not surprised. This is the way he's been his whole life; I like to think that Cub Scouts and Boy Scouts had this lasting

influence on him.   One neurologist told me that the best help for Tucker's concussions would be time and I am hoping that he was correct.

I blame part of this whole thing from January 6 on myself. Tucker is aware that I marched in a Vietnam march from the University of Washington down 45th and down the freeway to the courthouse in Seattle. It was not at all violent but it was huge and we closed the freeway and it was against the law. I am so sorry if this influenced my son. When Tucker told me that he was arrested, the shame he was feeling was palpable and obvious   Both he and Jesse came home and everything returned to normal with the same jobs, same house, and same phone numbers. Tucker doesn't even have traffic tickets. I am unsure, but I don't think I have ever even known a felon before. This is killing me.

I moved in with Tucker and we have lived together for the past year just trying to get through this sad and awful situation. January 6 was 3 1/2 years ago and life has returned to how it always was. Tucker has continued to be almost the person he always was basically, and I just really, really am praying that this will not distort him or me.

There are some more significant things that I have jumped over. I had cancer when Tucker was 11. However, even though it was 25 years ago, it was traumatic for both of us. I was amazed at how strong and steady he was through the whole situation. He didn't want to leave me, but he was forced to go to his dad's for visits. He was home when I was throwing up many times. I had chemo, radiation, and major surgery. He helped me every step of the way. It was not pretty, and it was not easy for either one of us, but it was worth it. I'm a survivor.

Through all this, there have been Tucker's cats. He keeps bringing them home. There have been too many to mention, but there was Griffy with one eye, and Wally, who was diabetic, and Eileen, who had four legs, but only 3 feet so she tilted and he named her Eileen ("I lean") - kind of funny. I am

4

also an older mom and instead of being embarrassed, Tucker is always helping, and I am so grateful. I don't want to be a burden to him. I was hoping he would at this point be married and be thinking about children. He'll be a great father and husband. I am hoping this happens while I'm still alive. I know it will take time for Tucker to lessen the shame. He is not nearly as social as he used to be.


Thank you so much for your time,

Deborah J. Dalman (Debby)
█████████████████
██████████████████
███████████████

Hon. Reggie B. Walton
United States District Court for the District of Columbia
Constitution Avenue, N.W.
Washington, D.C. 20001

May 3, 2024

Hon. Reggie B. Walton:

My name is Adnan Kaya and I work with vulnerable populations as a Substance Use Disorder
Professional in Everett, WA. I have known Tucker Weston since 2002 when we met in high
school French class and I consider him to be a good friend. I know during his early years he
suffered emotional and sometimes physical abuse from his father who had him out of wedlock
with his mother and was somewhat neglected by him. Despite this hardship Tucker took the
same honors and Advanced Placement classes as myself and we were roommates our
freshman year at the University of Washington.

During sophomore year of high school in 2003 Tucker invited me to check out boxing classes he
was attending in South Everett. I myself never started the sparing component of the training but
over the course of several months I saw Tucker engage in many unsuccessful attempts at
sparring and suffered severe blows to the head. I remember him complaining that he could not
focus on studying for chemistry anymore and over the course of several months starting to
believe he had suffered injuries he was not recovering from.

I consider my political viewpoints as liberal and have always voted Democrat. Tucker and I have
had many disagreements about politics over the past 22 years but he has always had respect
towards views that he does not agree with and is willing to listen to other people's perspectives.
A lot can be learned  when two people with opposite views sit down and have a cordial
conversation and consider the other's perspective. This is something that Tucker is capable of
and is a character asset that is ideal in a functional citizen.

I have not known Tucker to be a lawbreaker and I believe his lack of criminal record, other than
this case, reflects that. I have never known Tucker as aggressive or violent and his affect is that
of someone that is generally agreeable and gets along with most people. I believe Tucker would
never want to actually hurt anyone. He is someone that much rather makes peace and is very

slow to anger. He forgives easily. I don't actually think I have ever seen Tucker lose his temper since I have known him.

I have not known Tucker to have any radical political agendas. I believe he thought he was going to a protest and did not realize what he was getting himself into that day. During that time I believe he thought there was some kind of election fraud (I remember rolling my eyes a lot around him). I know he regrets his actions that day and feels shame around the beliefs that brought him to the Capitol Riots.

I believe Tucker's primary value is making sure that his mother who is in her mid 70's is safe and taken care of. Tucker is a hard worker and is currently under stress because he is not sure how his mother will be able to pay rent once he goes away. She is very reliant on Tucker to pay their rent and I know there are a lot of unknowns insofar what will happen to her once he goes to prison.

Thank you for taking the time to read this, and I know Tucker is remorseful for his actions that day.

Kind Regards,



Adnan Kaya

Hon. Reggie B. Walton
United States District Court for the District of Columbia
Constitution Avenue, N.W.
Washington, D.C. 20001

May 7, 2024

Hon. Reggie B. Walton,

My name is Corey Westbrook. I am 47 years old, and I work as an automotive mechanic for Edwards's Automotive in Shoreline, WA. I'm writing to you to provide a character reference for my cousin, Tucker Weston. I have known Tucker his entire life, and in fact, babysat him when he was little. Both my wife, and my children know Tucker. It is my understanding that he will soon be sentenced for his conduct at the Capitol riot on January 6th, 2021. I still have trouble believing he got caught up in that whole ordeal.

It would be insightful for you to know some background information about Tucker's life. He has faced his fair share of challenges, starting in his childhood. I was there when Tucker's father gained custody of him when he was young. At the time, his mother was going through cancer treatment at the University of Washington and we - his mother is my aunt - were not sure if she was going to survive. The limited visitation rights the court imposed on his mother emotionally tore Tucker apart. To make matters worse, Tucker was very isolated at his father's and I know his stepmother was emotionally abusive to him. She had her own children to raise, and did not take kindly to having to raise Tucker too. I find that troubling, because Tucker was an exceptionally well behaved child. I would know, I babysat him, and have 2 children of my own.

When Tucker was in his early teens he was involved in a boxing club in Everett, WA. I never attended, and was not involved, but I remember when Tucker got hurt. It is my understanding that he was sparring with another student, and he got hit hard in the head. He complained at the time about not feeling right, like he was "*living in a dream*". This injury left a lasting impact on him, and he maintains, some 21 years later, the same feelings. At the time, we noticed a change in him. He became more reserved, and quiet. Gone was the talkative, rambunctious teenager.

Tucker is not a confrontational or aggressive person. Infact, I have never known him to be political. Tucker and I have talked at length about January 6th and his involvement in the Capitol riot. He has consistently conveyed, to me, his sincere regret for his actions, and has told me that he "got caught up in a crowd mentality" and "made a stupid mistake". I absolutely believe him.

Tucker is truly a kind-hearted person and there is a story about him I'd like to share with you. Throughout Tucker's childhood his mother never had the money to purchase a decent vehicle, and the vehicles she had owned were very unreliable, and constantly broke down. This had always been a subject of stress for Debby (Tucker's mother) and Tucker knew that. So one day, in 2019, Tucker unexpectedly stopped by my work. He asked me to accompany him to a Subaru dealership in Ballard, Wa. I of course said 'yes' thinking Tucker was going to purchase a new Car for himself. Indeed, he did purchase a new vehicle, but not for himself. He bought a new Subaru Forester for his mother and paid it in full! I was there when it happened. In fact, I have attached a photo of Debby and me in her new car the day Tucker surprised her with it. You can see me in the passenger seat and Debby is in the driver's seat.

Tucker is very close to his mother, and she is very dependent on him. Debby is 76 years old and is in poor health. She has mobility limitations from a failed hip replacement and is currently battling skin cancer. She lives with Tucker and is dependent on him to cover rent. We are worried about Debby's future if Tucker is taken away. She is not well enough to work and has no other resources to support herself.

We know Tucker must pay for his actions on January 6th, but please understand that Tucker is an exceptionally kind, and good person. Violence, and aggression are not in Tucker's nature. Please show mercy when deciding over the appropriate sentence to impose on Tucker.

Sincerely,

*Corey Westbrook*

Corey Allen Westbrook



Hon. Reggie B. Walton
United States District Court for the District of Columbia
Constitution Avenue, N.W.
Washington, D.C. 20001

May 1, 2024

Hon. Reggie B. Walton:

One of my roles is that of being a personal assistant. I have worked for Tucker Weston's mother, Debby Dahlman, for over 20 years. Throughout the course of our extended business relationship, we have become friends and gotten to know each other's families. I was familiar with Tucker and heard many stories through Debby illustrating what an outstanding son and delightful person he is. Of course, that was from his mom, but I also have had the opportunity to see it for myself as we have spent time together over the years.

Due to changes in her living situations beyond her control, Tucker's mom has had to move a few times over the past number of years until she found an ideal arrangement. Tucker and I were the main people helping her with those moves. With each move, we spent many days and long hours together packing, hauling, and unloading a whole household in and out of homes and storage units, not once but three times. Through it all, I had the opportunity to observe how patient Tucker was with his mom and also how incredibly hard-working and pleasant he was to be around. As you can imagine there were tricky situations not only with the grueling physical aspect of moving boxes and furniture, but also a lot of emotions and varying opinions about the process and what she really needed to keep. Did I mention that his mom has a piano, a lot of heavy antique furniture, and collections of fine china and books? We had some frustrating and challenging situations and yet Tucker always remained calm, kind, and even funny, not just with me, but also with his mom.

I am a long-time volunteer and board member of Fallen Brothers, a local food bank in our area. Recently, Tucker has been volunteering with us. We pick up expired or nearly expired food from grocery stores, haul it to one of our distribution sites, pick through it to toss the bad stuff, sort the good stuff into boxes, and distribute the boxes to cars that go through our lines. This is labor-intensive, very unglamourous work that we do in every conceivable type of weather. Nevertheless, I can always count on Tucker to absolutely be one of the hardest workers we have, be completely responsible, be friendly with other volunteers, to use common sense, to be proactive, and be respectful of the people that come through our lines for food. Other volunteers are always happy when they know he is signed up to be on our team because he is so personable and hardworking.

I have heard about the charges against him and can testify it is **completely** out of character for him. I have never witnessed even a hint of aggression or unpleasant behavior in any situation, in any way – not even in his attitude. He is a decent and good person. I firmly believe he is an asset to the community and to the lives of those he knows. I am grateful to

know Tucker and to have the opportunity to interact with him and work together in various situations as I currently do. I always enjoy the time I spend with him and sincerely hope that opportunity continues.

Sincerely,

Laurie Hugdahl

Hon. Reggie B. Walton
United States District Court for the District of Columbia
Constitution Avenue, N.W.
Washington, D.C. 20001


 My name is Mary Pat O'Leary, and I know Mr. Weston through his caregiving role for my former husband, Mr. Scott Chambers.

Mr. Weston was a caregiver for Mr. Chambers and provided excellent personal care assistance. He was kind, attentive, and compassionate to Mr. Chambers. He maintained his patience when Mr. Chambers was demanding to be taken to car dealerships, despite his inability to drive. He did take Mr. Chambers for outings in his vehicle, and this provided an opportunity for Mr. Chambers to leave his home and helped him feel less isolated.  During these outings, Mr. Weston was required to stand by Mr. Chambers and support him in walking. He never rushed him and was always gentle when providing personal care.

Mr. Weston also cooked for Mr. Chambers, and this required patience, as Mr. Chambers sometimes wanted to eat items that were difficult to swallow, and he was at risk of choking. Mr. Weston was excellent in his approach to providing quality meals that were tasty as well as mechanically soft, thereby reducing the choking risk.

I was notified that Mr. Weston plead guilty to a criminal offense; however, I will tell you from personal experience I never witnessed any aggressive or hostile behavior from Mr. Weston. Mr. Weston has admitted responsibility for the offense, and it has truly impacted him. He is not a violent or aggressive person. He is dedicated to his work, his community, and to helping others. When my former husband passed, Mr. Weston supported me in my grief and loss, and showed remarkable compassion and sensitivity.

Sincerely,
Mary Pat O'Leary

Sandra Huggins Wikan
760 Cardinal Avenue NE
Ocean Shores, Washington 98569

25 April 2024

Hon. Reggie B. Walton
United States, District Court for the District of Columbia
Constitution Avenue, N.W.
Washington. D.C. 20001

Dear Honorable Judge Reggie B. Walton,

My name is Sandra Huggins Wikan. I am retired. My last employment was as a paraeducator in special education in the Darrington, Washington School district. I have known Tucker Weston and his mother, Debby Dallman, since Tucker was three years old. One of my sons is the same age as Tucker and they went to preschool together.

I have never known Tucker to be a troublemaker in any way. I have always found him to be extremely intelligent and mild-mannered. He is an exceptionally accomplished violinist... absolutely not a rabble rouser. I'm actually flabbergasted that he managed to get himself caught up in that big mess of January 6, 2021 at the Capitol Building in Washington D.C. and I know he regrets his involvement. That kind of thing is so out of character for him, I'm still having trouble believing that he was even there.

Tucker has a generous heart and has recently been helping to distribute food to the needy. I am sure there are more things that he would willingly do to benefit individuals and families in and near the community in which he now lives.

Tucker's mom needs him at home. They reside together. Debby is in her mid-70s and needs financial help paying household bills. She also needs Tucker to be there to help with many chores around their home, such as minor repairs, and keeping a good supply of firewood for heat. Please allow Tucker to pay his debt to society in a manner that will benefit others, especially his dear mother.

Sincerely,

*Sandra H. Wikan*

Sandra H. Wikan

Hon. Reggie B. Walton

United States District Court for the District of Columbia

Constitution Avenue, N.W.

Washington, D.C. 20001

To Whom It May Concern,

I am writing to provide a character reference for Tucker Weston, whom I have known for many years through his mother Debby Dallman. My name is Wilie Wellington and I am 79 years old, retired from private business.

I first became acquainted with Tucker Weston when he was just 10 years old. Debby Dallman, Tucker's mother, served as my mother's caregiver at the time, and through our connection, I had the opportunity to witness Tucker's upbringing and development firsthand.

Throughout his childhood, Tucker was consistently well-behaved and respectful. He never posed any discipline problems, and I frequently received positive reports about his conduct from his mother regarding his schooling.

Tucker is a valued member of our community and worked for many years as a transit operator for METRO King County Transit. This is a difficult job given the homeless population in downtown Seattle, and yet Tucker did well. He navigated the challenges posed by the homeless with professionalism and empathy, traits that are essential in such a demanding environment.

I was surprised to learn about Tucker's involvement at the capitol on January 6th, 2021. I have never known him to be a political person, and this type of conduct is out of character for him. I can personally attest that Tucker is not an aggressive, radical person.

Tucker's conduct on January 6th, 2021 has greatly affected him. He has since been terminated from employment at METRO, because of the charges he has pleaded guilty to. I have had the opportunity to speak with Tucker personally, and I can attest to his remorse and regret for his actions. He has expressed deep shame for his conduct, and has shown a genuine willingness to take responsibility for his actions.

In my interactions with Tucker, I have witnessed his remorse and determination to make amends. He has expressed a deep understanding of the impact his actions have had and is committed to taking the necessary steps towards positive change. His volunteer work at a local food bank is an example of this.

As this court considers Tucker's case, I urge Your Honor to take into account Tucker's genuine efforts towards redemption. I am confident that with the appropriate support and guidance, Tucker will emerge from this experience a better person.

Sincerely,


Wilie Wellinngton